# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

In re: )
)
ROBERT R. BAZZELL )
) 04-05851-TOM-7
Debtor, )

_____

MARLO BAZZELL-SAUNDERS )
)
Plaintiff )
)
v. ) A.P. No. 04-00137-TOM
)
ROBERT R. BAZZELL )
)
Defendant. )

## <u>MEMORANDUM OPINION AND ORDER</u>

The matter before this Court is the complaint to determine the dischargeability of a hold-

harmless obligation for a debt pursuant to 11 U.S.C. § 523(a)(15) filed by Marlo Bazzell-Saunders

("Plaintiff") in the above-styled Chapter 7 case of Robert R. Bazzell ("Debtor" or "Defendant"). At

the trial on August 22, 2005, Debtor appeared with his counsel, Roy J. Brown, and Plaintiff appeared

with her counsel, Frederick Mott Garfield. This Court has jurisdiction pursuant to 28 U.S.C.

§1334(b) (1994)[1] and the district court's General Order Of Reference.[2]  This is a core proceeding

---

[1] **28 U.S.C. §1334(b)** provides:
Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than
the district courts, the district courts shall have original but not exclusive jurisdiction of all civil
proceedings arising under title 11 or arising in or related to cases under title 11.

[2] The **General Order of Reference Dated July 16, 1984, As Amended July 17,
1984** issued by the United States District Court for the Northern District of Alabama provides:
The general order of reference entered July 16, 1984, is hereby amended to add that there be hereby
referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under

arising in a case under Title 11 of the United States Code as defined in 28 U.S.C. §157(b)(2)(I)

(1994).[3]

The Court has considered the pleadings, the testimony and exhibits, the arguments and the

law. The Court also has taken judicial notice of the documents filed in the Debtors' case as allowed

by Federal Rule of Bankruptcy Procedure 9017.[4] In accordance with Federal Rule of Bankruptcy

Procedure 7052,[5] the Court makes the following findings of fact and conclusions of law.

## I. Findings of Fact

On June 30, 2004, Defendant filed this Chapter 7 bankruptcy case and on August 9, 2004,

Plaintiff timely filed a complaint to determine the dischargeability of a debt in the Debtor's Chapter

7 case. Plaintiff alleges Debtor owes her a nondischargeable debt for $2,146.00 for a child support

---

the Bankruptcy Act.

[3] **28 U.S.C. §157(b)(2)(I)** provides:
(b)(2)Core proceedings include, but are not limited to--
    (I) determinations as to the dischargeability of particular debts;

[4] **Fed. R. Bankr. P. 9017, Evidence** provides the following:
The Federal Rules of Evidence and Rules 43, 44 and 44.1 F. R. Civ. P. apply in cases under the Code.

**Fed. R. Evid. 201, Judicial Notice of Adjudicative Facts** provides, in part:
(a) Scope of Rule. This rule governs only judicial notice of adjudicative facts.
(b) Kinds of Facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is...capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
(c) When Discretionary. A court may take judicial notice, whether requested or not.
The Court may take judicial notice of such undisputed facts as the filing of documents in the main bankruptcy case with the Court and orders previously issued by the Court in the case. State of Florida v. Charley Toppino & Sons, Inc. 514 F.2d 700 (5th Cir. 1975).

[5]**Fed. R. Bankr. P. 7052, Findings by the Court** provides:
Rule 52 F.R. Civ. P. applies in adversary proceedings.
    **Fed. R. Civ. P. 52 Findings by the Court; Judgment on Partial Findings** provides:
(a) In all actions tried upon the facts without a jury...the court shall find facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58...

2

arrearage. She also alleges that his agreement to hold her harmless as to the I.R.S. debt ($2,257.00) and the First Commercial Bank debt ($35,721.15) is a nondischargeable obligation. At trial, the parties stipulated that Debtor's obligation to the I.R.S. and for child support due to the Plaintiff are nondischargeable. Remaining is the Debtor's hold-harmless agreement in the Judgment of Divorce regarding the debt to First Commercial Bank (hereafter "the Loan") which Plaintiff alleges is of the type described in 11 U.S.C. § 523(a)(15) and is nondischargeable.[6]

## A. Background Information

The Plaintiff testified that she and Mr. Bazzell married on October 1, 1994, and have two children. She also testified that while expecting their daughter in December 1999, they built a home together in Louisville, Kentucky.[7] Plaintiff testified that after they built their home in December 1999, they consolidated some debts and obtained a second mortgage on the home. When Mr. Bazzell transferred to Birmingham, the Bazzell's sold their home in Louisville. Ms. Bazzell-Saunders testified that the sale price was insufficient to pay both mortgages and to pay off the second mortgage on the Louisville home, she claims they took out the Loan with First Commercial Bank. Mr. Bazzell does not recall the purpose of the Loan.[8] The Promissory Note to First Commercial

_____

[6] First Commercial Bank filed suit in state court against the Plaintiff and Defendant on June 18, 2004, seeking a judgment for the balance due of $35,721.15. That suit is stayed as to the Defendant, and the Bank is awaiting the outcome of this action to pursue Plaintiff.

[7] Plaintiff's recollection is inconsistent, because Plaintiff originally testified that her daughter was born November 7, 1997, and her son was born October 25, 1999. Based on this testimony, in December 1999, both children would have been born by the time the Bazzell's began building a home in Louisville, Kentucky.

[8] Entered into evidence is a copy of the promissory note to First Commercial Bank. Defendant's Ex. 12. Attached to the note is a comments page stating that the Loan was made to "exercise stock options Marlo has with her employer, Papa Johns Pizza (corporate)." Although hearsay, the document is not being asserted for its truth, but to impeach Plaintiff's testimony that

3

admitted into evidence is dated April 22, 1999.[9]  Defendant's Ex.12.

The parties decided to move back to Alabama, and when Debtor took a job in Birmingham with Maxus Construction, Inc., the Bazzell's bought a home in Pelham.  Several years later, the Bazzells filed for divorce in Shelby County, Alabama and the Final Judgment of Divorce was entered February 6, 2003.  Plaintiff's Ex. 1.  Pursuant to the divorce decree, which adopted the agreement of the parties, the assets and obligations were divided and custody and child support were determined.  In paragraph 25 of the Divorce Agreement, Mr. Bazzell agreed to assume responsibility for the First Commercial Loan[10] and to hold harmless Ms. Bazzell-Saunders.  Id.  Plaintiff testified that Defendant was to start paying off the debt before the divorce, and Defendant has made 12 payments on the First Commercial Loan.  Defendant's Ex. 12.  The payments ranged from $416.70 to $479.22 and were made between March 2002 and March 2003.  Id.

### B. Plaintiff's Financial Information

At the time of the divorce,  Plaintiff testified she was vice-president of human resources for P.J. Cheese, Inc.[11]  On August 23, 2003, about six months after her divorce from Defendant,

---

the Loan was to pay off a second mortgage on the Louisville home. Such extrinsic evidence is admissible as a prior inconsistent statement pursuant to Federal Rule of Evidence 613. See also Fed. R .Evid. 607 ("The credibility of a witness may be attacked by any party, including the party calling the witness.")

[9] Thus the Plaintiff's testimony is confusing, because if the Loan was to cover the short fall from the sale of the Louisville home, it should have been entered into after they built the home in December 1999, not before.

[10] The amount indicated in the Judgment of Divorce was $20,000.00.  Plaintiff's Ex. 1. The suit filed by First Commercial Bank seeks a judgment for $35,721.15.  Plaintiff's Ex. 3.

[11] P.J. Cheese, Inc. is also known as Papa John's.  Plaintiff testified she had fringe benefits with her employment, including a 401k and health and dental insurance.
    Plaintiff testified she does not have a college degree, but attended Auburn University for

4

Plaintiff married Stephen Saunders, and they reside in Richmond, Virginia. After her move to Virginia, she continued to work with P.J. Cheese for a while and then quit in December of 2003. She testified that she has no current ownership in P.J. Cheese.[12] The joint tax return of the Plaintiff and Mr. Saunders for 2003 was for $229,406.00. Defendant's Ex. 3. At the time of filing the return, Plaintiff was working and had a base salary of $74,000.00. The next year, 2004, the Saunders' joint tax return was for $150,000.00. Defendant's Ex. 3A. This reflects the income reduction following Plaintiff's resignation from her job. She and Mr. Saunders have several joint accounts, including a savings account with a balance of $6,911.77 from February 2004 to April 2005. Defendant's Ex. 5 through 7.

Plaintiff and Mr. Saunders have custody of their one-year-old daughter, Selena, in addition to the Plaintiff's two children with the Defendant and Mr. Saunders' daughter from his previous marriage. Plaintiff testified that Mr. Saunders supports their family and that she is currently receiving $625.00 a month in child support.[13] The Virginia home Plaintiff shares with her husband was purchased recently and is in his name only. Mr. Saunders pays all the expenses for the family, including the cost of a housekeeper. Ms. Bazzell-Saunders drives a 2002 Oldsmobile mini-van,

---

one year and took some classes at University of Alabama in Birmingham.

[12]This was a privately-held company beginning in 2001. Plaintiff testified that while employed there she could purchase ownership in the corporation through pay-roll deduction. She testified to paying on a $20,000.00 promissory note she gave to P.J. Cheese to purchase that amount of ownership in the company. If she had paid off the note and the company was doing well, Plaintiff could have had an ownership interest. Plaintiff denied these "stock options" were the reason for the Loan.

[13]Plaintiff and Defendant entered into an agreement subsequent to the divorce. A consent order entered by the circuit court lowered the Defendant's child support from $1,148.40 to $625.00 a month. Plaintiff's Ex. 2.

5

valued around $7,000.00, that is paid for and in her name.

Pursuant to the Divorce Agreement, Plaintiff was awarded ownership of the home in Pelham and she refinanced it so the property and the mortgage are in her name only. Plaintiff's Ex. 1. Plaintiff testified she has had the home rented in the past for $1,200.00 per month, but is unable to rent the home right now due to cosmetic problems. However, Ms. Bazzell-Saunders testified the present value of the home is around $125,000.00, roughly the amount of the mortgage, but believes the home would sell for less due to needed repairs. The IRS has a lien on the Pelham home for taxes owed from Plaintiff and Defendant's joint filings in 2001 and 2002. Plaintiff's Ex. 7. Plaintiff testified she paid her half of the taxes, but Defendant still owes around $2,250.00 plus interest and penalties.

If the debt to Plaintiff (the hold-harmless provision regarding the First Commercial Loan) is discharged, Ms. Bazzell-Saunders, who testified she is currently a stay-at-home mother, contends she will have to return to work to pay off the Loan. This would allegedly hurt her marriage and children, because she would have to put them in day care which would cost around $500.00 a week for four children. Plaintiff testified that her husband has indicated that he will not pay this debt.

### C. Defendant's Financial Information

#### 1. Income and Expenses

For 2003, Defendant worked for Maxus and earned $52,363.00, and when he filed bankruptcy in 2004, his monthly income with Maxus was $3,279.00 and his annual income was $53,244.35. Defendant's Ex. 9 and 10. In 2005, Defendant changed jobs and began working for

6

Innovative Contracting Solutions, Inc. ("ICS").[14]  He makes around $52,600.00 a year. Defendant's

Ex. 11.

After the divorce in early 2003, Defendant moved into an apartment and by the time he filed

this bankruptcy case in 2004, his monthly expenses were around $3,310.00.  A summary of his

current  monthly expenses are as follows:[15]

| Item | Expense |
| --- | --- |
| Food | $400.00 |
| Rent | $755.00 |
| Utilities/ Phone/Water | $175.00 |
| Doctor/Dentist/Drugs | $26.33 |
| Clothes/Barber | $86.00 |
| Car Payments and Maintenance | $700.00 |
| Gas | $300.00 |
| Car Insurance | $104.00*[16] |
| Child Support | $625.00 |
| Children's Travel and Day Care | $245.83 |
| Entertainment | $200.00 |
| Church | $200.00* |
| IRA Contribution | $100.00 |

---

[14]Mr. Bazzell testified that he often worked in the Florida panhandle while employed with Maxus.  Although he received reimbursement for travel, food and gas, it did not cover all his expenses.  ICS pays him less, but he works locally and saves on travel expenses.

[15]See Defendant's Ex. 7. Defendant testified that his net pay check has already deducted his health insurance, so that amount is excluded from this list of expenses.

[16]These * items reflect the amount testified to at the trial as compared with Defendant's Ex. 8.

7

| Life Insurance | $67.00 |
| IRS Debt | $100.00 |
| Miscellaneous | $146.66 |
| **Total Expenses** | **$4,230.82** |
| **Net Monthly Income** | **$3,041.95**[17] |

Defendant testified that this list more accurately depicts his expenses than his bankruptcy schedules. His total monthly expenses are greater than his net income, creating a short-fall of $1,188.87[18] per month. He does not have a 401K, but has just started putting money into an IRA each month. He is currently on a payment plan with the IRS to pay off his share of the taxes. He drives a 1998 truck with 140,000 miles. Defendant testified that in January 2005, he incurred truck repair expenses of $4,400.00. He is also responsible for his children's expenses for travel to Birmingham and home when he gets his visitation, and he pays for their child care while they are with him.[19] The children's travel expense in the last 12 months was $3,500.00. He testified that he recently obtained a new credit card to pay for the children's air fare and the balance of his truck repairs.

Defendant has been a construction superintendent for seven years and testified that he has little opportunity to "move up."[20] In this superintendent position, he hopes to some day advance in

---

[17]This figure is based on Defendant's weekly net income less taxes. Defendant's Ex. 11. At trial, Defendant testified his net income was $3,025.22.

[18] At trial, Defendant testified his deficit was $1,341.38 a month.

[19] The Consent Order allows the Defendant to see his children for half the summer, half of spring break and one week at Christmas. Plaintiff's Ex. 2.

[20]Mr. Bazzell testified he attended high school and in 1986, completed a technical school.

8

his job and acquire bigger projects. His current salary is comparable to those similarly situated in other companies. He has not received any bonuses while working for ICS and his work allows no time for side jobs. The Defendant argues that he has no ability to pay the First Commercial Loan. He asserts that he assumed the Loan payments in good faith, but if he is unable to discharge the obligation in bankruptcy, it will result in greater hardship towards him than any benefit to Plaintiff.

## 2. Assets and Liabilities

The following table summarizes pertinent asset and liability information reflected in the Chapter 7 schedules:

| Assets and Liabilities | Value or Amount |
|---|---|
| Household goods/furniture | $800.00 |
| **Total Assets** | $12,455.00[21] |
| First Commercial Bank Loan | $35,000.00 |
| IRS | $5,185.16 |
| Credit Cards | $10,987.90[22] |
| **Total Liabilities** | $67,174.06 |

Defendant testified that after his divorce he incurred some debt on his credit cards to pay living expenses and child support and that these debts were part of the decision to file this bankruptcy case.

## II Conclusions of Law

There are two issues raised in the dischargeability proceeding. First, whether a $35,721.15

---

[21]This includes a 1998 Dodge Ram valued around $10,000.00 in Schedule B.

[22]There were two credit card debts listed in the schedules. Defendant disputed the $7,359.92 debt listed to Providian National Bank. He claims he had two Providian credit cards for living expenses: one with an amount of $1,500.00 and another he does not recall.

9

debt owed by Debtor to Plaintiff is of the type described in 11 U.S.C. § 523(a)(15) as nondischargeable. Second, whether the debt is dischargeable under either subsection (A) or (B) of § 523(a)(15). The parties stipulated[23] that Plaintiff must establish the marital debt obligation exists and its occurrence. Once this burden is met the burden shifts to Defendant to establish ability to pay and its detrimental consequences to the parties. If the debtor meets his burden under § 523(a)(15)(A) and (B), the burden shifts to the Plaintiff to rebut.

### (A) Whether the Debt is Nondischargeable Under § 523(a)(15)

Under the provisions of 11 U.S.C. § 523, creditors may seek to have particular debts owed to them excepted from a debtor's discharge in bankruptcy. However, in furtherance of Congress' fresh start policy for debtors under the Bankruptcy Code, such exceptions to discharge should be construed strictly in favor of the debtor. In re Fretz, 244 F.3d 1323, 1327 (11th Cir. 2001)(citing In re Griffith, 206 F.3d 1389, 1394 (11th Cir. 2000); Local Loan Co. v. Hunt, 292 U.S. 234 (1934). Congress added § 523(a)(15) to the list of nondischargeable debts as part of the Bankruptcy Reform Act of 1994. 4 Lawrence P. King, Collier On Bankruptcy ¶ 523.21 (15th ed. rev. 1997). Section 523(a)(15) limits the debtor's ability to discharge non-support types of marital property debts arising from a separation or divorce to two situations: where the debtor is unable to pay such debts or where the benefit to the debtor of nonpayment outweighs the resulting detriment to the nondebtor spouse.

Specifically, § 523(a)(15) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt —
    (15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement,

---

[23]The parties rely on In re Stone, 199 B.R. 753, 783 (Bankr. N.D. Ala. 1996). See also In re Reetz, 281 B.R. 54 (Bankr. S.D. Ala. 2001).

divorce decree or other order of a court of record...unless —

> (A) the debtor does not have the ability to pay such debt from the income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor...; or
> (B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

The plain language of this section contemplates that the debt in question must be owed to the former spouse, must have arisen from a court order issued in a separation or divorce proceeding and must not be of the type described in § 523(a)(5)[24] - i.e., a debt that is "actually in the nature of alimony, maintenance or support."

Plaintiff's complaint alleges that the debt at issue is nondischargeable pursuant to § 523(a)(15) and neither party has alleged nor asserted that this debt is in the nature of alimony, maintenance or support. Additionally, the debt seems to clearly be a hold-harmless obligation incurred by the Defendant pursuant to the Divorce Agreement, rather than maintenance, alimony or support. Further, the Divorce Agreement contained a separate provision for "Child Support" in paragraph 13, which was to be paid at the rate of $1,148.40[25] monthly. Therefore, this $35,721.15 Loan assumed by Debtor and the subject of a hold-harmless provision of the Divorce Agreement is

---

[24] **11 U.S.C. § 523(a)(5)** provides in part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual from any debt—

> (5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that--
> ... such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support.

[25] Currently this amount is $625.00 a month, pursuant to a consent order. <u>Plaintiff's Ex. 2</u>.

of the type described in § 523(a)(15) and it is not a § 523(a)(5) debt "actually in the nature of alimony, maintenance or support."

### (B) Whether the Debt is Dischargeable Under Subsection (A) or (B)

_____This hold-harmless agreement regarding the First Commercial Loan obligation is dischargeable if the Debtor can show either an inability to pay under subsection (A) or that under subsection (B) nonpayment of the debt will result in a benefit to Debtor that outweighs the detrimental consequences to Plaintiff.

### (1) Subsection (A): Debtor's Inability to Pay the Debt

Courts have considered many factors in analyzing whether the debtor has the ability to repay the nonsupport marital debt, including whether forcing the debtor to pay the debt will "reduce the debtor's income below the amount which is necessary for the support of himself and his dependants." In re Reetz, 281 B.R. at 58. This inquiry examines a debtor's present and future financial circumstances. Id.; See Matter of McGinnis, 194 B.R. 917, 920 (Bankr. N.D. Ala. 1996). "A debtor has the ability to pay an obligation, for purposes of 11 U.S.C. § 523(a)(15), if the debtor has sufficient disposable income to pay all or part of the property settlement within a reasonable amount of time." Id. at 59 (quoting In re Smithers 194 B.R. 102 (Bankr. W.D. Ky. 1996)).

The legislative history of § 523(a)(15) with respect to subsection (A) provides the following guidance for courts analyzing a debtor's ability to pay the nonsupport debt:

> In some instances, divorcing spouses have agreed to make payments of marital debts, holding the other spouse harmless from those debts, in exchange for a reduction in alimony payments. In other cases, spouses have agreed to lower alimony based on a larger property settlement. If such "hold harmless" and property settlement obligations are not found to be in the nature of alimony, maintenance or support, they are dischargeable under current law. The nondebtor spouse may be saddled with substantial debt and little or no alimony or support. This subsection will make such

Case 04-05851-TOM7    Doc 14    Filed 10/04/05    Entered 10/04/05 13:42:02    Desc Main
Document      Page 12 of 18

obligations nondischargeable in cases where the debtor has the ability to pay them...In other words, the debt will remain dischargeable if paying the debt would reduce the debtor's income below that necessary for the support of the debtor and the debtor's dependents.

H.R. Rep. No. 835, 103d Cong., 2nd Sess. 54 (1994), reprinted in 1994 U.S.C.C.A.N. 3363.

Based on the legislative history, this Court concludes that where the debtor either agreed to pay or was ordered by a domestic court to pay the obligation owed to a former family member by making periodic payments over a period of time, Congress intended the bankruptcy court to determine the debtor's ability to pay by looking at feasibility and cash flow over a similar period of time and not just the ability to pay on a particular day. This long-term approach to determining the debtor's ability to pay necessarily includes analyzing whether the debtor has the present ability to pay the debt and whether he is likely to be able to pay this debt in the future. Thus, this Court must consider the following with respect to Debtor: history of employment and salary, potential or likely future employment, and living expenses historically and in the future. Accordingly, the Court will consider Debtor's income and expenses at the time of filing the Chapter 7 petition and at the time of trial.

Debtor and Plaintiff divorced in February of 2003, and Debtor assumed responsibility for the First Commercial Loan in the Divorce Agreement. At the time, he was still employed with Maxus, earning $52,363.00 in 2003. When he filed bankruptcy in 2004, Defendant earned $53,244.35 annually, but his liabilities (including the Loan) exceeded his assets by $54,719.06 and his expenses exceeded his income by $31.00. In 2005, the Defendant began working for ICS, earning $52,600.00 annually. Currently, his monthly expenses exceed his monthly income by $1,324.76.

The Defendant does not expect any substantial increases in his pay in the near future, because his salary is consistent with what others make in his field. It is possible, he testified, that he may be

Case 04-05851-TOM7    Doc 14    Filed 10/04/05    Entered 10/04/05 13:42:02    Desc Main
Document    Page 13 of 18

able to move up to bigger projects and earn more, but that is uncertain and too speculative in this Court's view. He also testified that his job is demanding and not merely a forty-hour a week job, so that there is no time for him to supplement his income with outside or additional employment. No contrary evidence regarding Defendant's income or potential to earn income was offered. It appears to the Court that Defendant's income is likely to remain at or near the current amount of around $53,000.00 or $54,000.00.

There was no testimony at trial to suggest Defendant's monthly expenses as listed either in the schedules or in Defendant's Ex. 8 are extravagant. Although his monthly expenses have increased since filing his schedules, the Court does not find them excessive. His food expense increased because the schedules reflect only his grocery bills and no lunches or eating out, and this Court finds $400.00 a month on food to be reasonable. The Defendant does not drive a new or luxury vehicle and in fact, he incurred increased car expense due to repair work on an older vehicle with high mileage. Mr. Bazzell's rent payments have increased $100.00 because he is on a month to month basis as he looks for a cheaper place to live. Furthermore, $755.00 a month on rent is not extravagant considering that he needs sufficient room for his children's visits. The children's daycare and travel expenses are well detailed, appear reasonable and are listed in his expenses, and he has merely allocated these items over 12 months. He is also allotting $100.00 monthly that he intends to pay to the I.R.S. and has stipulated he will pay amounts owed and to be owed regarding child support. Mr. Bazzell might be able cut back on his $200.00 monthly entertainment expenses, but eliminating this would still leave a deficit of nearly $1,000.00 a month. This Court finds that based upon the testimony and evidence, Defendant does not appear to be able to make any payments on the bank Loan.

14

## (2) Subsection (B): The Balancing Test

Under this discharge exception, the Court must weigh the benefit to Debtor of discharging the debt against the detrimental consequences to Plaintiff of discharging the debt. This test requires more than a comparative determination of which party is in the better position with respect to payment or nonpayment of the debt.[26] Rather, it requires a subjective analysis to determine whether the benefit from relieving Debtor of the obligation to pay this debt exceeds the resulting harm to Plaintiff from nonpayment of the debt. Factors that bankruptcy courts consider in balancing the debtor's benefit and plaintiff's detriment in the event of discharge include the parties' current income and expenses, employment and potential employment, number of dependents, and assets and liabilities.[27] This Court will consider these factors and also feels it should consider the parties' relative and respective lifestyles at the time of divorce and as they are presently, and what they are likely to be in the future in order to determine the benefit to Debtor and the harm to Plaintiff if the debt is discharged.

Pursuant to the Divorce Agreement, Plaintiff received the marital home in Pelham, Alabama. She contends it is more of a liability than an asset due to cosmetic problems and I.R.S. liens. The home has, however, previously rented for $1,200.00 a month. In addition, at the time of the divorce

---

[26] See Anthony v. Anthony (In re Anthony), 190 B.R. 429, 433 (Bankr. N.D. Ala. 1995): "The (balancing) test is not which party is in the better position to pay the debt. The test is whether the benefit to the Debtor outweighs the harm to (the Plaintiff ex-spouse)." Clearly, when two people and often their children split one household into two, neither is in as good a financial position as before the split.

[27] In re Christison, 201 B.R. 298, 310-12 (Bankr. M.D. Fla. 1996); Humiston v. Huddleston (In re Huddleston), 194 B.R. 681, 689-90 (Bankr. N.D. Ga. 1996); In re Dressler, 194 B.R. 290, 305-6 (Bankr. D.R.I. 1996); Anthony v.Anthony ( In re Anthony), 190 B.R. 433, 439-40 (Bankr. N.D. Ala. 1995), aff'd on reh'g, 190 B.R. 429 (Bankr. N.D. Ala. 1995); In re Hill, 184 B.R. 750, 756 (Bankr. N.D. Ill. 1995).

in 2003, Plaintiff had an earning capacity of $74,000.00 a year as vice-president of human resources for P.J. Cheese, Inc. When she married Mr. Saunders, their joint income for 2003 was over $225,000.00 and even after quitting her job in December 2003, the 2004 tax return shows income available to them as a couple to be $150,000.00. Ms. Bazzell-Saunders is presently staying at home to raise four children and pursuant to the Consent Order, is receiving child support of $625.00 per month from Defendant. However, Mr. Saunders financially supports his wife and family; this support includes payment of the mortgage, all utilities, groceries, clothing, insurance, all transportation expenses and even a housekeeper. It appears from Plaintiff's testimony that her current husband is able and willing to continue to support her and their family in this fashion. If Mr. Saunders is, as Plaintiff testified, unwilling to pay this loan, the worse case scenarios for Plaintiff are that either she file her own bankruptcy case (to discharge her obligation to First Commercial) or she could return to work and put the children in daycare to allow her to have income to pay First Commercial. Although daycare is expensive, Plaintiff's employment history reflects she was earning more than Defendant when she quit her job and based on that salary, she would have more than sufficient income to pay daycare and the Loan payments. While the Court recognizes that Plaintiff prefers to be a stay-at-home mother, the Court cannot ignore the pure dollars and cents. She can work, pay daycare and pay the Loan even if she would prefer not to do so.

In comparison, Debtor has no disposable income to put towards the Loan. His liabilities and expenses already outweigh his assets and income. To not discharge this debt would result in his going further in the hole each and every month and would result in a great detriment to Mr. Bazzell outweighing any benefit Plaintiff would receive from a determination that the debt is nondischargeable. "A bankruptcy court should not deny the debtor his fresh start simply because his

16

former wife has chosen not to seek the same relief on her own behalf when her circumstances warrant it." In re Reetz, 281 B.R. at 60 (citing In re Daiker, 5 B.R. 348, 352 (Bankr. D. Minn. 1980). Defendant seeks a fresh start from the Chapter 7 bankruptcy. His lifestyle is not extravagant and he is paying child support. Defendant has a solid job and has maximized his earning capacity. He is trying to make ends meet and has no excess funds from which he can pay the Loan.

An additional factor to be considered in this case is that the date of the Loan document is inconsistent with the Plaintiff's recollection of the facts. She testified that the Loan was to pay the balance of the second mortgage on the Louisville house so they could close the sale on the home. However, she also had testified the home was built in December of 1999, around eight months after the Loan was originally made.[28] Finally, no explanation was provided why the Judgment of Divorce referenced a loan to First Commercial in the amount of $20,000.00 when the note was for $37,673.00. Since this complaint was brought by the Plaintiff, this information and explanation should have been provided by her. This Court finds the Debtor's benefit of a discharge of this debt far outweighs any alleged detriment to Plaintiff, including the burden of daycare costs and a home that allegedly cannot be rented.

### III. Conclusion

The $20,000.00 owed by Defendant to Plaintiff as a result of the hold-harmless provision pursuant to the parties' Divorce Agreement is not a debt actually in the nature of alimony, maintenance or support as defined in § 523(a)(5). However, it is the type of debt included in § 523(a)(15) and pursuant to subsections (A) and (B) this obligation is due to be discharged.

---

[28] She also inconsistently testified about the date of her children's births, alleging to have had both children by October 1999, but to have been pregnant with her daughter in December 1999, when they built the home in Louisville. See note 7, supra.

17

Accordingly, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that the relief sought by the Plaintiff, Marlo

Bazzell-Saunders, in the Complaint is **DENIED** and the hold-harmless agreement regarding the debt

to First Commercial Bank in the Final Judgement of Divorce dissolving the marriage of Marlo

Bazzell-Saunders and Robert Bazzell is declared **DISCHARGEABLE**.

Dated this the 4th day of October, 2005.


**/s/ Tamara O. Mitchell**
TAMARA O. MITCHELL
United States Bankruptcy Judge


TOM:eaj

xc:    Frederick Mott Garfield, Attorney for Plaintiff
       Roy J. Brown, Attorney for Defendant

Case 04-05851-TOM7   Doc 14   Filed 10/04/05   Entered 10/04/05 13:42:02   Desc Main
Document    Page 18 of 18